UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NASTASSA POSSO
JAIME ROLF
JANE DOE-1

                    Plaintiffs

                                                    CIVIL ACTION NO._____

                                                    JURY TRIAL DEMANDED

vs.

NIAGARA UNIVERSITY,

                    Defendant.
_____

## COMPLAINT

Plaintiffs, as and for their Complaint, by their undersigned attorneys, allege as follows:

## STATEMENT OF THE CASE

1.      Plaintiffs NASTASHA POSSO ("Posso") and JAIME ROLF ("Rolf") are female students currently enrolled at Defendant Niagara University ("NIAGARA" or "Defendant"). Plaintiff JANE DOE-1 ("Doe-1") previously attended Niagara until May 2018. Plaintiffs Posso and Rolf were members of the women's swim team at Niagara University. Plaintiff Doe-1 was a member of the diving team at Niagara University.

2.      This is an action for discrimination by Niagara University on the basis of sex and in the operation of its athletic department.  Niagara discriminated against Plaintiffs on the basis of sex in violation of Title IX of the Education Amendments of 1972 (20 U.S.C. §1681 *et seq.*) and the regulations adopted pursuant thereto (34 C.F.R. part 106) (collectively, "Title IX").

3.      As a Division 1 mid-major school, Niagara University is a member of the National Collegiate Athletic Association (NCAA). Niagara sponsors a women's swim team and a diving team which compete in the Metro Atlantic Athletic Conference (MAAC). Each of the Plaintiffs earned an athletic scholarship to attend Niagara. According to Niagara's website, the average cost of attending the university is about $19,300.

4.      The women's swimming team did not have its own coach. During the relevant time frame, Ben Nigro was the coach of the men's team and he also coached the women's team. All practices were co-ed. In addition to practicing with the men's team, the women traveled on the

same bus to swim meets. Mandatory meetings and other activities were conducted as if the men's and women's swim teams were "one team." The diving team was coached during certain times relevant to this action by Brooke Nigro, the spouse of Ben Nigro. Members of the men's swimming team were allowed access to the diving team's practices, meetings and other activities. Women divers also traveled on the same bus with the swimming teams to meets.

5.      The manner in which the swimming and diving programs were run resulted in a hostile environment in which each of the plaintiffs was subjected to severe and pervasive sexual harassment and bullying by members of the men's swimming team. As a direct consequence, each plaintiff suffered psychological and emotional harm. They each have sought medical treatment and/or counseling for persistent depression which, in at least one instance, manifested in a suicide attempt.

6.      Nigro was aware of some of the offensive conduct based on his presence at practices and on other occasions when it occurred. In addition, each of the Plaintiffs made complaints to Nigro, who alternately ignored them or ridiculed them, and failed to take appropriate remedial action thereby showing deliberate indifference to their mistreatment. One of the plaintiffs filed a Title IX complaint which, to date, has been pending for eight (8) months without resolution. Upon information and belief, Ben Nigro is still under contract with Niagara as the swimming team coach.

7.      The Defendant discriminated against the Plaintiffs on the basis of sex in violation of Title IX of the Education Amendments of 1972 (20 U.S.C. §1681 *et seq.*) and the regulations adopted pursuant thereto (34 C.F.R. part 106) (collectively, "Title IX"). The Plaintiffs were also subjected to sex-based harassment by peers. Because university officials (swim coach, assistant athletic director) knew or reasonably should have known about the harassment, affirmatively created the atmosphere which allowed it to occur, and failed to take appropriate remedial measures to prevent it, the Defendant is liable for the harassment.

## PARTIES

8.      Plaintiff NASTASSA POSSO, at all times relevant, is a female student and athlete who currently attends Niagara University. In High School in Florida, Posso was a two-time regional champion in both the 500 and 200 meter free, and reached the final heat of the Florida state championship meet. She was recruited to swim for Niagara University as well as other Division 1 swimming programs. Throughout her time at Niagara, Posso was subjected to sexual harassment and abuse, as well as retaliation when she complained to Defendant about that abuse, by male members of the swimming team. As a result of that treatment, and the Defendant's failure to appropriately address the pervasive culture of sexual harassment and abuse, and retaliation, in its swimming and diving programs, Posso was diagnosed with and sought treatment for depression. She is a Senior, and remains a member of the women's swimming team. During the school year she resides in Niagara County which is within the jurisdiction of this Court

9.      Plaintiff JAIME ROLF, at all times relevant, is a female student and athlete who currently attends Niagara University and is a senior. Rolf was a Section III champion in breast stroke her junior and senior years in high school. She was recruited to swim for Niagara University. During her first two years at Niagara University, she was subjected to sexual harassment and abuse by male swimming team members, as well as retaliation when she complained to Defendant about that abuse. In February 2018, Rolf forfeited her swimming scholarship after her sophomore year and left the team, choosing instead to attend a one semester program at the Disney College in Orlando, Florida. Rolf left Niagara University at that time to avoid being continually harassed. She has since paid tuition, costs and fees with an expectation of having to pay additional tuition, costs and fees through graduation in order to complete her degree. She has sought treatment for anxiety and depression caused by the sexual harassment and abuse to which she was subjected. She was isolated at practices, shamed because of her weight and body, and not given an equivalent time with the coaches when compared with the coaching the male swimmers received. The sexual harassment and abuse negatively affected her grades and when the male swimmers were in her classes she was too intimidated to actively participate. The abuse was to such a degree and for such a duration that she was deemed by medical providers for a time to be suicidal. During the school year she resides in Niagara County which is in the jurisdiction of this court.

10.      Plaintiff JANE DOE-1, at all times relevant, was a female student and athlete who formerly attended Niagara University and graduated in May 2018. Doe-1 was a four-time Section III diving champion in High School. She was recruited to dive for Niagara University as well as other Division 1 diving programs. Doe-1 was a diver on the diving team throughout her four years at Niagara University. Throughout her time at Niagara, Doe-1 was subjected to sexual harassment and abuse, as well as retaliation when she complained to Defendant about that abuse, by male members of the swimming team. As a result of that treatment, and the Defendant's failure to appropriately address the pervasive culture of sexual harassment and abuse, and retaliation, in its swimming and diving programs, Doe-1 suffered from anxiety and depression, and both her academic and athletic performance were negatively affected.

11.      Defendant NIAGARA UNIVERSITY was and is a domestic corporation with a principal place of business located at 5795 Lewiston Road, Niagara University, New York 14109.

12.      Niagara receives federal financial assistance and associated benefits. Therefore, all programs at Niagara, including intercollegiate athletics, are subject to the requirements of Title IX.

## JURISDICTION & VENUE

13.      The Plaintiffs' legal claims are based on alleged violations of 20 U.S.C. §1681, *et seq.*, its interpreting regulations and Department of Education/Office of Civil Rights policies. Jurisdiction is conferred pursuant to 28 U.S.C. § 1331, 1343(3) and 1343(4)

14.      Jurisdiction for declaratory and other relief is invoked pursuant to 28 U.S.C. §§2201 and 2202.

15.    Venue in this action is proper pursuant to 28 U.S.C. §1391 as a substantial part of the events, acts or omissions giving rise to plaintiffs' claims occurred in this district.


16.    This Court has subject matter jurisdiction.

## FACTUAL ALLEGATIONS

17.    Title IX (20 U.S.C. §§1681-1688), enacted in 1972, provides in relevant part:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . ."

20 U.S.C. §1681(a)

18.    Athletics programs are considered educational programs and activities. There are three basic parts of Title IX as it applies to athletics:

1.    Participation: Title IX requires that women and men be provided equitable opportunities to participate in sports. Title IX does not require institutions to offer identical sports but an equal opportunity to play;
2.    Scholarships: Title IX requires that female and male student-athletes receive athletics scholarship dollars proportional to their participation; and
3.    Other benefits: Title IX requires the equal treatment of female and male student-athletes in the provisions of: (a) equipment and supplies; (b) scheduling of games and practice times; (c) travel and daily allowance/per diem; (d) access to tutoring; (e) coaching, (f) locker rooms, practice and competitive facilities; (g) medical and training facilities and services; (h) housing and dining facilities and services; (i) publicity and promotions; (j) support services and (k) recruitment of student-athletes.

19.    The Civil Rights Restoration Act of 1987 made plain Congress' intent that the terms "program or activity" as used in Title IX, mean any program or activity so long as any part of the public institution receives federal financial assistance. 20 U.S.C. §1687.  Thus, the Defendant is subject to Title IX even if none of the funding for either its men's or women's athletic program comes from federal sources.

20.    In 1975, the Department of Health, Education and Welfare ("HEW"), the predecessor of the United States Department of Education ("DEd") adopted regulations interpreting Title IX. These regulations (the "Regulations") are codified at 34 C.F.R. Part 106. These regulations are enforced by the Office for Civil Rights ("OCR") within the DEd.

21.     With regard to athletic programs, 34 C.F.R. §106.41(a) provides that interscholastic athletics are included within the "program or activity" requirements of Title IX:

> "No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis."

22.     That section specifies 10 factors that are considered in the determination of equal athletic opportunity:

1.     Whether the selections of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

2.     The provision of equipment and supplies;

3.     Scheduling of games and practice times;

4.     Travel and per diem allowances;

5.     Opportunity to receive coaching and academic tutoring;

6.     Assignment and compensation of coaches and tutors;

7.     Provision of locker rooms, practice and competitive facilities;

8.     Provision of medical and training services;

9.     Provision of housing and dining facilities and services; and

10.    Publicity.

23.     Forty years ago, in 1979, the OCR published a policy interpretation of Title IX and the Regulations as applied to intercollegiate athletics. This policy interpretation is found at 44 Federal Register 71,413 (the "Policy Interpretation"). The Policy Interpretation provides that in order to comply with title IX and 34 C.F.R. §106.41(c), schools must provide equal athletic opportunities in three general areas:  1) equal athletic participation opportunities, 2) equal treatment and benefits to those with participation opportunities, and 3) equal athletic financial assistance. At the present time, the "equal treatment" prong is at issue in this case. 34 C.F.R.§106.41(c)(2)-(10).

24.     According to the Policy Interpretation, compliance in the area of "equal treatment" is determined under the following test:

25.     The Regulations require that sponsors of intercollegiate athletics such as Defendant take such remedial actions as are necessary to overcome the effects of sex discrimination in violation of Title IX. *See* 34 C.F.R.§106.3(a). Upon information and belief, Defendant did not take any remedial action to satisfy its obligations under Title IX.

26.     Title IX conditions an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the government and the recipient of funds. This contractual framework focuses on "protecting" individuals from discriminatory practices carried out by recipients of federal funds.

27.     There are over 550 four-year colleges with women's swimming across four division levels (D1, D2, D3 and NAIA) in the United States. Niagara University sponsors a variety of intercollegiate athletic teams for both men and women. It is a member of the NCAA and the MAAC conference. Its teams participate in Division I, the highest level of collegiate competition.

28.     Niagara offers athletic scholarships to members of its varsity athletic teams. Like other Division 1 schools, Niagara recruits high school students to apply to and enroll for the purpose of participating in its varsity athletic program. The Plaintiffs were recruited to attend Niagara in order to participate on its women's varsity swim and diving teams. They would not have enrolled at Niagara but for the opportunity to participate in women's varsity swimming and the receipt of an athletic scholarship.

29.     Although Niagara's website uses the labels "men's" and "women's" swimming teams, in truth there is one co-ed swimming team. There is a single coach and several assistant coaches or graduate student assistants. Upon information and belief, for the entire period relevant to this Complaint, the Coach has been male and all assistant coaches have been male. There has not been a female swim team coach. This fact has contributed to perpetuation of harassment based on gender and the overall hostile environment of the swim team at NIAGARA.

30.     According to the Defendant's website: "Compliance with NCAA and MAAC rules is of utmost importance to Niagara University and its athletics department. As a member of the NCAA, Niagara University is responsible for the actions of its coaches, student-athletes, faculty, staff, alumni, donors, boosters, and friends."

31.     Niagara University maintains a Student-Athlete Code of Conduct, pursuant to which Student-athletes must comply with: "The rules, policies and procedures found in the Niagara University Student Handbook. The rules, policies and procedures found in the Niagara University Undergraduate and Graduate Catalogs. Municipal, County, State and Federal laws, both civil and criminal. National Collegiate Athletic Association (NCAA).  Metro Atlantic Athletic Conference (MAAC). . . The directions of their coach, trainer, and Department of Athletics staff.   The rules set forth in this Code of Conduct." Subjecting a fellow student-athlete to cruel and unusual psychological conditions would be a violation of the Code of Conduct.

32.     Additionally, Niagara maintains a policy regarding sexual harassment pursuant to which coaches and athletic staff are considered mandatory reporters under Title IX. Schools have a responsibility to provide a safe and nondiscriminatory environment for all students. Harassment

that targets student based on gender is harassment based on sex and the Federal Education Department's Office of Civil Rights enforces Title IX accordingly. If sex-based harassment creates a hostile environment, the school must take prompt and effective steps to end the harassment, prevent its recurrence and, as appropriate, remedy its effects.

33.     Bullying fosters a climate of fear and disrespect that can seriously impair the physical and psychological health of its victims and create conditions that negatively affect learning thereby undermining the ability of students to achieve their full potential. Civil rights statutes such as Title IX and its implementing regulations may be violated when peer harassment based on gender is sufficiently serious that it creates a hostile environment and such harassment is encouraged, tolerated, not adequately addressed or ignored by school employees.

34.     Harassing conduct may take many forms, including verbal acts and name-calling; graphic and written statements which may include use of cell phones or social media; or other conduct that may be physically threatening, harmful, or humiliating. Harassment does not have to include intent to harm, be directed at a specific target or involve repeated in incidents. Harassment creates a hostile environment when the conduct is sufficiently severe, pervasive or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities or opportunities offered by a school.

35.     A school is responsible for addressing harassment incidents about which it knows or reasonably should have known. In some situations, in addition to being widespread or well-known to students and/or staff, the school may become aware of misconduct, triggering an investigation that could lead to the discovery of other incidents that taken together, may constitute a hostile environment. When responding to harassment a school must take immediate and appropriate action to investigate or otherwise determine what occurred. And the inquiry should be prompt, thorough and impartial. Any steps taken to rectify the situation should not punish the victim of the harassment.

36.     When the behavior implicates the civil rights laws, school administrators should look beyond simply disciplining the perpetrators; while that is likely a necessary step, it often is insufficient. A school's responsibility is to eliminate the hostile environment created by the harassment, address its effects and take steps to ensure that harassment does not recur. The unique effects of discrimination may demand a different response than would other types of bullying.

37.     Sexual harassment can include making sexual comments, jokes, or gestures; writing or displaying sexually explicit pictures or materials; calling students sexually charged names; spreading sexual rumors; rating students on sexual activity, performance or physical appearance; circulating emails or websites of a sexual nature.

38.     All student-athletes are required to participate in sexual assault and harassment training. This training will comply with New York State and NCAA regulations.

## INJUNCTIVE/DECLARATORY RELIEF

39.     Plaintiffs NASTASSA POSSO and JAIME ROLF are entitled to injunctive relief that restrains Defendant from continuing to discriminate on the basis of sex. This requires in part that Defendant take necessary measures to eliminate harassment based on gender, hire a coach to work with the women's swim team and, in all other respects, provide equal treatment and benefits to its female swimmers. Defendant should reinstate POSSO's and ROLF's swimming scholarships while they retain NCAA eligibility.

40.     Failure to grant the requested injunctive relief will cause Plaintiffs POSSO and ROLF irreparable harm by continuing Defendant's discrimination against them. As members of the women's swim team, they were subjected to harassment which caused them to quit the team and forfeit their scholarship.  In doing so, they were denied the other benefits associated with participation in intercollegiate sports including academic, physical, psychological, social and economic benefits now and into the future. The opportunity costs and loss of these benefits will have lifelong effects and cannot be adequately compensated with money.

41.     The injunctive relief sought is in the public's interest since it will bring Defendant into compliance with federal law and help increase awareness of sexual harassment in college athletics.

42.     Plaintiffs seek an Order declaring that Defendant has engaged in a past and continuing pattern and practice of discrimination against female students on the basis of sex in the operation of its athletic program, specifically the women's swimming team, in violation of Title IX and the regulations promulgated thereunder.

43.     Plaintiffs further seek permanent injunctive relief requiring Defendant to stop discriminating in the operation of its athletic department; ordering Defendant to provide a plan approved by the Court to take action consistent with the equal treatment requirement of Title IX and which will eliminate harassment based on gender; and ordering Defendant to reinstate swimming scholarships for Plaintiffs POSSO & ROLF.

44.     Plaintiffs' are entitled to reasonable attorneys fees and expenses pursuant to 42 U.S.C. §1988.

## FIRST CAUSE OF ACTION UNDER TITLE IX
### (Unequal Treatment)

45.     Plaintiffs reallege and incorporate herein by this reference paragraphs 1 through 44 inclusive of this Complaint.

46.     Plaintiffs seek economic and compensatory damages associated with, among other things, lost opportunities, including opportunities to train and stay in competitive shape, emotional distress, diminution in the value of their undergraduate record for future employment purposes,

loss of self-esteem, humiliation, psychological harm and the denial of equal treatment on the basis of sex.

47.     **No separate women's teams:** In addition to swimming and diving, there were mandatory activities including practices and travelling to meets which were all co-ed. While Title IX permits a co-ed team in the context of non-contact sports, aspects of Niagara's swimming and diving program structure permitted, fostered and created a hostile environment. For example, over a period of at least five years, men and women were required to stay on the same floors in hotels; the Coach made sexual remarks, encouraged women to simply ignore derogatory language used by male swimmers, and failed to report or take steps to eliminate gender-based harassment, including body-shaming. While plaintiffs learned during recruiting visits the men and women sometimes practiced together, they didn't realize the women didn't really have their own team or own coaching staff; nor were they told that male and female swimmers and divers were required to be together as a team every day – they practiced, studied and ate together and participated in other mandatory joint training and social activities.

48.     **Equipment and supplies**: The male swimmers received additional swim gear that the female swimmers did not receive. Also, in 2017/18 the males received shirts for participating in the MAAC championships. The Coach would give smaller sizes to the female team while the men were given first choice. Female swimmers were denied large or extra-large sizes. In one case a 5'11" female swimmer had to wear medium-sized sweatpants that were ill-fitting.

49.     **Opportunity to receive coaching**:  In effect, the women's swim team was an appendage of the men's swim team. They were effectively one team, with one coach. The coach generally spent time with the fastest swimmers who tended to be men. The women received less feedback and were routinely the target of verbal abuse by male swimmers on the pool deck or elsewhere in the coach's presence for which the male swimmers were not counseled or disciplined. There has never been a female assistant coach or graduate assistant coach.

50.     **Compensation of Coaches:** Upon information and belief, the university employed a female diving coach when one or more of the plaintiffs were members of the women's swim team. This coach had no responsibility for coaching the women's swim team. Several women who left the swim team due to harassment subsequently joined the diving team which was predominantly women. During the 2015 season, the female diving coach refused to travel to meets with the team due to insufficient compensation. Upon information and belief, the female diving coach resigned in 2016 due to insufficient compensation.

51.     As a direct and proximate result of the above conduct, Plaintiffs sustained damages including, without limitation, emotional distress, loss of economic opportunities, medical expenses, and other direct and consequential damages. As a result of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial plus attorneys fees, expenses, costs and disbursements.

## SECOND CAUSE OF ACTION UNDER TITLE IX
### (Gender-Based Harassment)

52.     Plaintiffs reallege and incorporate herein by this reference paragraphs 1 through 51 inclusive of this Complaint.

53.     Plaintiffs allege they (1) were students who were (2) subjected to harassment (3) based upon sex; (4) that the harassment was sufficiently severe and pervasive to create an abusive educational environment and (5) that a cognizable basis for institutional liability exists.

54.     Coach Ben Nigro was a school official, authorized and required to take corrective action, who had actual knowledge of the sexual harassment and either failed to act or exhibited "deliberate indifference" to it. Nigro failed to investigate or otherwise respond to Plaintiffs' complaints of harassment. His deliberate indifference subjected Plaintiffs to sexual harassment and made them vulnerable to it.

55.     At least as early as the 2016 Spring semester, a formal complaint was made by DOE-1 to the Assistant Athletic Director about Coach Nigro. For example, she disclosed that on one occasion after hearing that a male swimmer had sex with a female recruit he said "He must not have been very good since she [the recruit] is not coming to NU."

56.      In 2015-16 and 2017-18, a male swimmer complained that the Coach brings up topics of "mothers, sexuality and sexual intercourse" and makes inappropriate comments "about having sex with mothers, sexual preferences and all-around rude comments."

57.     In addition to making sexual comments, the Coach also failed to prevent male swimmers themselves from making similarly offensive and inappropriate comments. For example,
* Male swimmers used the word "cunt", "pussy" and "slut" to describe female swimmers
* male swimmers targeted female swimmers for body-shaming by:
    o making whale noises during practices,
    o calling a female swimmer "water buffalo,"
    o moaning to emulate sexual gratification,
    o making weight-based comments or calling female swimmers "fat" or other derogatory names,
    o Ranking female swimmers by physical appearance.

58.     Sexual innuendos and comments made by swimmers such as "finish harder," "get it up, get it in," "let's get wet" are engrained in the overall environment of the swimming team. During a swim meet at another school, such a comment was made in front of a referee. There were also sexual conversations on the bus rides to and from meets in the presence of the Coach who was aware of the general nature of such conversations.

59.     The harassment was primarily verbal as opposed to physical conduct. However, plaintiff Doe-1 was intentionally pushed by a male swimmer into a bush. The male swimmers referred to Doe-1 as "Princess thigh gap" legs while on the pool deck with the Coach present.

60.     The coach's failure to discipline or sanction male swimmers encouraged an environment in which they were permitted to bully, intimidate and humiliate female swimmers.

61.     Female swimmers who complained to the Coach about offensive treatment from male swimmers were advised to:
- "be a duck" (let the comments roll off her like water rolls off a duck's back),
- that "90% is how you react and 10% is what they do",
- that the male swimmer's misbehavior is simply due to immaturity, and
- that "boys will be boys."

62.     In effect, the Coach's response to complaints of harassment or bullying was to tell the victims to adjust their own behavior.

63.     As a direct and proximate result of the above conduct, Plaintiffs sustained damages including, without limitation, emotional distress, loss of economic opportunities, medical expenses, and other direct and consequential damages. As a result of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial plus attorneys fees, expenses, costs and disbursements.


## THIRD CAUSE OF ACTION UNDER TITLE IX
### (Negligent Administration of Title IX investigation)


64.     Plaintiffs reallege and incorporate herein by this reference paragraphs 1 through 63 inclusive of this Complaint.

65.     Niagara was negligent in conducting the Title IX investigation. After one plaintiff filed a complaint in early December 2018, the university Title IX coordinator believed her complaint to be the result of personal animosity with a male swimmer who she used to date. When the matter was eventually recognized as Title IX harassment an internal and external investigator were appointed.

66.     The first interviews of witnesses were conducted in January 2019. A total of 22 witnesses were interviewed. It took investigators five months, until the end of May 2019, to complete the investigation. The delay was in part due to the work schedule of the internal investigator.

67.     The inordinate delay in investigating the complaints by the plaintiffs allowed time for some of the male swim members who had engaged in the offending behavior to graduate, thus avoiding any discipline or sanction. The complaint was still pending at the start of the 2019-2020 school year and the plaintiff was subjected to and feared retaliation.

68.     The delay further resulted in other swimmers, who could corroborate plaintiff's allegations, graduating and either declining to participate in the investigation or becoming effectively unavailable to investigators.

69.     The IX complaint remains unresolved. It took investigators another four months to write a factfinding report. That report has not yet been transmitted to the Dean for his review and to make a determination as to whether there were any violations of the student conduct policy.

70.     In addition to the prolonged time frame, the investigators ignored certain information submitted by Plaintiffs. They applied different standards to the victims of harassment by refusing to credit their allegations unless corroborated while finding other witnesses credible even in the absence of corroboration. They demonstrated a bias against the victims. They did not properly consider the scope of Title IX in relation to bullying complaints. They misinterpreted Title IX provisions by, for example, finding that derogatory comments made on the basis of gender were sometimes not heard by the targeted person and therefore concluded they were of a less serious nature.

71.     As a direct and proximate result of the above conduct, Plaintiffs sustained damages including, without limitation, emotional distress, loss of economic opportunities, medical expenses, and other direct and consequential damages. As a result of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial plus attorneys fees, expenses, costs and disbursements.


## FOURTH CAUSE OF ACTION
### (Common Law Negligence)

72.     Plaintiffs reallege and incorporate herein by this reference paragraphs 1 through 71 inclusive of this Complaint.

73.     Defendant owed a duty of care to Plaintiffs. Such duties included, without limitation, a duty not to discriminate, to provide equal treatment and opportunities and a duty to prevent harassment on the basis of their sex.

74.     Defendant breached its duties owed to Plaintiffs by failing to properly train its staff, including but not limited to the swimming coach, about gender-based harassment; by failing to properly supervise and discipline the swimming coach based on past complaints of gender-based discrimination or harassment; for negligently retaining the swimming coach after credible complaints of misconduct were made against him.

75.     As a direct and proximate result of the above conduct, Plaintiffs sustained damages including, without limitation, emotional distress, loss of economic opportunities, medical expenses, and other direct and consequential damages. As a result of the foregoing, Plaintiffs are

entitled to damages in an amount to be determined at trial plus attorneys fees, expenses, costs and disbursements.

## FIFTH CAUSE OF ACTION
### (Breach of Contract)

76.     Plaintiffs reallege and incorporate herein by this reference paragraphs 1through 75 inclusive of this Complaint.

77.     Based on the aforementioned facts and circumstances, Defendant breached express and/or implied agreement(s) with Plaintiffs to provide them with scholarships to attend Niagara University.

78.     As a direct and foreseeable consequence of these breaches, Plaintiffs sustained damages including, without limitation, emotional distress, loss of educational and economic opportunities and other direct and consequential damages.  Plaintiffs are entitled to recover damages for Defendant's breach of the express and/or implied agreements.

79.     As a direct and proximate cause of the above conduct, actions and inactions, Plaintiffs have suffered physical, emotional and economic injuries. As a result of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial plus attorneys fees, expenses, costs and disbursements.

## RELIEF SOUGHT

**WHEREFORE,** plaintiffs respectfully request that this Court enter judgment in their favor on all causes of action and award the following relief:

(1) On their first cause of action for unequal treatment under Title IX, an Order compelling Defendant to comply with its obligations under Title IX by providing equal treatment to the women's swim team and preventing harassment based on gender; further, maintaining jurisdiction over this action to monitor Defendant's compliance with the Court's orders; Plaintiffs also seek judgment in an amount not currently ascertainable but which exceeds the $75,000 jurisdictional threshold of this Court for compensatory damages and other monetary relief as permitted by law; an award of attorneys fees and expenses.

(2) On their second cause of action for gender-based harassment under Title IX, Plaintiffs seek judgment in an amount not currently ascertainable but which exceeds the $75,000 jurisdictional threshold of this Court for compensatory damages and other monetary relief as permitted by law; an award of attorneys fees and expenses.;

(3) On their third cause of action for negligent administration of Title IX investigation, Plaintiffs seek judgment in an amount not currently ascertainable but which exceeds the $75,000

jurisdictional threshold of this Court for compensatory damages and other monetary relief as permitted by law; an award of attorneys fees and expenses.;

(4) On their fourth cause of action for common law negligence, Plaintiffs seek judgment in an amount not currently ascertainable but which exceeds the $75,000 jurisdictional threshold of this Court for compensatory damages and other monetary relief as permitted by law; an award of attorneys fees and expenses.;

(5) On their fifth cause of action for breach of contract, Plaintiffs seek judgment in an amount not currently ascertainable but which exceeds the $75,000 jurisdictional threshold of this Court for compensatory damages and other monetary relief as permitted by law; an award of attorneys fees and expenses.

(6) Such other and further relief as this Court may deem just and proper

PLAINTIFFS DEMAND A TRIAL BY JURY AS TO ALL ISSUES HEREIN TRIABLE TO A JURY

Dated:  Buffalo, New York
        September 20, 2019

                              PERSONIUS MELBER
                              Attorneys for Plaintiffs
                              By: /s/Brian Melber
                                    Brian Melber, Esq.
                              2100 Main Place Tower
                              Buffalo, New York 14202
                              716-855-1050
                              Bmm@personiusmelber.com


                              MEYERS  BUTH LAW GROUP pllc
                              Attorneys for Plaintiffs
                              By: /s/ Cheryl Meyers Buth
                                    Cheryl Meyers Buth, Esq.
                                    Laurie A. Baker, Esq.
                              21 Princeton Place, ste 105
                              Orchard Park, New York 14127
                              716-508-8598
                              cmbuth@mblg.us