UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

NASTASSJA POSSO, *et al.*,

        Plaintiffs,

    v.                                                        19-CV-1293-LJV-MJR
                                                                DECISION & ORDER
NIAGARA UNIVERSITY,

        Defendant.

## INTRODUCTION

On September 20, 2019, plaintiffs Nastassja Posso, Jamie Rolf, and Jane Doe-1 filed this action against the defendant, Niagara University ("Niagara"). Docket Item 1. On October 17, 2019, an amended complaint was filed, adding Jane Doe-2 as a plaintiff.[1] Docket Item 13. The amended complaint asserts claims under 20 U.S.C. § 1681(a) *et seq.* ("Title IX") for unequal treatment, gender-based harassment, and negligent administration of a Title IX program, as well as for common-law negligence and breach of contract. *See id.*

On December 6, 2019, Niagara moved to dismiss the amended complaint, in part, under Federal Rule of Civil Procedure 12(b)(6). Docket Item 14. Relevant to this decision, Niagara moved to dismiss Doe-2's Title IX claim for gender-based harassment and Rolf's claim for breach of contract.[2]

---

[1] The Court refers to Posso, Rolf, Doe-1, and Doe-2 collectively as "the plaintiffs."

[2] Niagara also moved to dismiss the plaintiffs' claims for Title IX negligent administration and common-law negligence and Posso's claim for breach of contract.

On December 9, 2019, the case was referred to United States Magistrate Judge Michael J. Roemer for all proceedings under 28 U.S.C. §§ 636(b)(1)(A) and (B).  Docket Item 15.  On July 29, 2020, the plaintiffs responded to the motion to dismiss, Docket Item 19, and on August 12, 2020, Niagara replied, Docket Item 20.  On August 19, 2020, Judge Roemer heard oral argument and requested supplemental briefing.  *See* Docket Item 21.  On August 26, 2020, the plaintiffs filed a supplemental brief, Docket Item 22; and on September 4, 2020, Niagara responded, Docket Item 23.

On November 2, 2020, Judge Roemer issued a Report and Recommendation ("R&R") finding that Niagara's motion to dismiss should be granted in part and denied in part.  Docket Item 24.  Judge Roemer specifically found that the motion to dismiss should be (1) denied with respect to Doe-2's pre-assault claim, *id.* at 12; (2) granted with respect to Doe-2's post-assault claim, *id.* at 20; and (3) granted with respect to Rolf's breach of contract claim, *id.* at 27.  Judge Roemer also recommended that the plaintiffs "be given an opportunity to amend their complaint in regard to the post-assault allegations."  *Id.* at 28.

On November 16, 2020, Niagara objected to the R&R.  Docket Item 28.  On December 9, 2020, Doe-2 responded to the objection.  Docket Item 31.  And on December 22, 2020, Niagara replied.  Docket Item 32.

---

*See* Docket Item 14.  The plaintiffs consented to the dismissal of these claims, *see* Docket Item 19 at 2, and they therefore are dismissed.

Niagara also moved for an order directing the plaintiffs to provide defense counsel with the names and identities of Doe-1 and Doe-2.  *See* Docket Item 14.  The plaintiffs agreed to disclose this information during mediation.  Docket Item 19 at 3.  Niagara's request therefore is denied as moot.

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).  The court must review *de novo* those portions of a magistrate judge's recommendation to which a party objects.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

This Court has carefully and thoroughly reviewed the R&R; the record in this case; the objection, response, and reply; and the materials submitted to Judge Roemer.  Based on that *de novo* review, the Court accepts and adopts Judge Roemer's recommendation to deny the motion to dismiss in part.[3]

## **FACTUAL ALLEGATIONS**

On a motion to dismiss, the Court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Trustees of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016) (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014)).  Given that standard, the following are the operative facts.

The plaintiffs are current or former female students at Niagara.  Docket Item 13 at ¶¶ 1, 20-23.  Posso, Rolf, and Doe-1 were members of Niagara's swimming and diving teams,[4] where they experienced sexual and gender-based harassment by male

---

[3] Niagara requested oral argument of its objections, Docket Item 28 at 4, n.1, but the Court finds that oral argument is not necessary and denies that request.

[4] For brevity, the Court refers to the swimming and diving teams collectively as "the swim team" or "swimming team," and swimmers and divers collectively as "swimmers."  Although Niagara purports to have separate women's and men's swim teams, "in truth there is one co-ed swim team."  Docket Item 13 at ¶ 51.  "The women's swim team did not have its own coach.  During the relevant time frame[,] Ben Nigro was the coach of the men's team[,] and he also coached the women's team."  *Id.* at ¶ 5.  "All

swimmers.  *Id.* at ¶¶ 7, 20-23.  In 2018, "to escape the constant harassment," Rolf left the swim team and, in doing so, forfeited her swimming scholarship.  *Id.* at ¶¶ 21, 63.  The harassment also "caused [Posso] to go on inactive status" on the team.  *Id.* at ¶ 63.

Doe-2 was not a member of the swim team, but she too experienced sexual harassment by a male swimmer.  *Id.* at ¶¶ 14, 23.  In 2018, a male swimmer raped her and then attempted into intimidate her by leaving a threatening voice message and being near her on campus.  *Id.* at ¶¶ 14, 23, 82.

"The manner in which [Niagara] operated its . . . swimming and diving program[] marginalized women and resulted in a hostile environment."  *Id.* at ¶ 2.  A "lack of adult control left the students on the teams to impose their own discipline and rules," which ultimately put the male swimmers "in a position to exert power and control over the women."  *Id.* at ¶ 7.  The result was an environment in which male swimmers regularly sexually harassed female swimmers without consequence.  *See id.* at ¶¶ 78-81.

Male swimmers "repeatedly" called female swimmers derogatory names like "cunt," "pussy," and "slut."[5]  *Id.* at ¶ 78.  Male swimmers would remark about female swimmers' bodies and "targeted female swimmers for body-shaming" by "making whale

_____

practices were co-ed," and the women traveled with and stayed on the same hotel floor as men during out-of-town travel.  *Id.*

Similarly, the swimming and diving teams acted as a single team.  *See id.* at ¶ 6, 9.  For much of the relevant time period, the diving team did not have its own coach.  *Id.* at ¶ 9.  The swimming and diving teams attended "jointly held meetings and other mandatory activities" together.  *Id.* at ¶ 6.  And "[m]ale and female divers also traveled on the same bus with the swim teams to meets and stayed in the same hotels."  *Id.*

[5] The Court has chosen to repeat these words—rather than water them down with asterisks—to communicate the impact that they likely had on the women who were targeted by them.

noises" and calling female swimmers names such as "water buffalo," "fat," and "[p]rincess thigh gap."  *Id.* at ¶¶ 78, 81.  Male swimmers "[r]ank[ed] female swimmers by physical appearance."   *Id.* at ¶ 78.  They also would make "[s]exual innuendos," such as "finish harder," "get it up, get it in," and "let's get wet," and they would "moan[] to emulate sexual gratification."  *Id.* at ¶¶ 78, 80.  This behavior was not sporadic; indeed, it was "engrained in the overall environment of the swimming team."  *Id.* at ¶ 80.

Although the abuse primarily was verbal, there were instances of physical violence as well.  *See id.* at ¶¶ 81-82.  For example, a male swimmer "intentionally pushed" Doe-1 "into a bush[,] cutting her leg."  *Id.* at ¶ 81.  "[One] male swimmer h[eld] a female swimmer's head under water until she struggled to breathe."  *Id.* at ¶ 82. Another "bit[] a female swimmer" on the arm, bruising her.  *Id.*

As early as 2016, the sexual harassment was reported to coaches, administrators, and the Title IX office, but no remedial action was taken to address it. *See, e.g.*, *id.* at ¶¶ 10-11, 17, 56, 83.

The head swimming coach, Ben Nigro ("Ben"[6]), observed much of the harassing behavior, but he did not discipline the male swimmers involved, nor did he otherwise take appropriate remedial measures.  *Id.* at ¶ 83.  In fact, Ben himself made inappropriate sexual remarks to swimmers.  *Id.* at ¶¶ 76-78.  For example, he "brought up topics of 'mothers, sexuality[,] and sexual intercourse,' and made [] comments 'about having sex with mothers, [and] sexual preferences.'"  *Id.* at ¶ 77.  "[O]n one occasion[,]

---

[6] Because Ben Nigro's wife, Brooke Nigro, also played a role in this matter, the Court will refer to them by their first names to simplify and avoid confusion.

after hearing that a male swimmer had sex with a female recruit[, Ben] said, '[h]e must

not have been very good since she [the recruit] is not coming to [Niagara].'"  *Id.* at ¶ 76.

Female swimmers, including Rosso, Rolf, and Doe-1, also reported the

harassment that they were experiencing to Ben, *id.* at ¶¶ 8, 84, but Ben either "ignored

[] or ridiculed them" for reporting the harassment, *id.* at ¶ 8.  He excused the male

swimmers' behavior as "boys will be boys," and he suggested that the "victims [should]

adjust their own behavior" instead.  *Id.* at ¶¶ 84-85.  Because he was an athletic coach,

Ben was a "mandatory reporter[] under Title IX"—that is, he was obligated to report

sexual harassment once he became aware of it.  *Id.* at ¶ 56.  But Ben did not report the

harassment.  *See id.* at ¶¶ 78, 83.

Doe-1 also reported the harassment to the former diving coach and Ben's wife,

Brooke Nigro ("Brooke").  *Id.* at ¶ 9.  "By at least 2016," Doe-1 told Brooke "about

offensive conduct by members of the men's swim team."  *Id.*  Brooke also witnessed

some of the harassment herself.  *Id.*  Like Ben, Brooke was a mandatory reporter; and

like Ben, she did not report the harassment or take other remedial action in response to

Doe-1's complaints or the harassment that she witnessed.  *Id.* at ¶¶ 9, 56.

After Brooke left her position in the middle of the 2016 season, the diving team

did not have a coach until 2018.  *Id.* at ¶ 9.  In the interim, "the students on the dive

team were not accompanied or supervised by a coach when they traveled to out of town

meets with the swim teams."  *Id.*

In spring 2016, Doe-1 reported the harassment to Susan Roarke, the former

associate athletic director.  *Id.* at ¶ 10.  Doe-1 told Roarke about "the mistreatment of

women swimmers by male swimmers, specifically that the coaches operated the swim

and dive teams in a way that permitted sexual harassment and bullying to continue

unabated . . . [and] that Coach Ben Nigro made inappropriate sexual comments." *Id.*

Doe-1 also told Roarke the comment Ben made about the male swimmer having sex

with a recruit. *Id.* at ¶ 76. But "Roarke did not offer any assistance and failed to take

remedial action." *Id.* at ¶ 10.

Doe-1 also reported the harassment to Simon Gray, the athletic director. *Id.* at ¶

11. "Gray likewise failed to address her complaints or take remedial action." *Id.*

Doe-1's report was not the first of its kind that Gray had heard: he had met with another

female swimmer who "told him that she had been the target of a male swimmer's

offensive verbal slurs about her gender and perceived sexual orientation" as well as

about the biting incident. *Id.* These male swimmers "were considered high-value

recruits," however, and therefore were allowed to continue on the swim team. *Id.* In

fact, one of them became a "graduate assistant coach under Ben," which put him in a

position of power over female swimmers. *See id.* at ¶¶ 11, 51.

In December 2018, Doe-1 reported the harassment to the Title IX coordinator,

Ryan Thompson, and filed a formal complaint. *Id.* at ¶ 12. Thompson did not

adequately explain to Doe-1 "the available off-campus sexual harassment/assault and

crisis management services . . . ; that these services would be provided free-of-cost to

students who requested them; and that counselors specifically trained to deal with

sexual harassment/assault victims would come to campus to meet with [her]." *Id.* at ¶

44.

At some point, another female swimmer reported to the Dean of Students, Jason A. Jakubowski, that male swimmers "harass[ed] and bull[ied]" female swimmers. *Id.* at ¶ 17. Jakubowski also "failed to take any remedial action." *Id.*

It then got worse. During the fall 2018 semester, a male swimmer raped Doe-2 during her freshman year at Niagara. *See id.* at ¶ 13. She was seventeen years old. *Id.* at ¶ 23. In January 2019, after the assault, Doe-2 "received a threatening phone message from a man she believed to be the same individual who had assaulted her." *See id.* at ¶ 14.

Doe-2 reported the assault and the phone call to a campus security officer who referred her to the Title IX office. *Id.* at ¶¶ 14-15. She then met with Thompson, the Title IX coordinator, and "ask[ed him] about the Title IX process." *Id.* at ¶ 15. Thompson "told her it would be difficult on her if she filed a formal complaint and influenced her not to do so." *Id.* He also "told her that because there were no weapons or threats involved, or any 'additional violence', [sic] he did not have to conduct a formal investigation." *Id.* Thompson ultimately "convinced" Doe-2 that a "mutual" no-contact order[7] "would be a better option" for her, and she chose that option. *Id.* Thompson never told Doe-2 about the off-campus sexual assault services that were available to her. *Id.* at ¶ 44.

Jakubowski sent Doe-2 the mutual no-contact order with an email that "failed to acknowledge that [Doe-2] was a victim of a sexual assault and that the threatening

---

[7] A "mutual" no-contact order is one in which both parties are prohibited from contacting each other; in contrast, a no-contact order is one in which only the party accused of sexual misconduct is prohibited from contacting the alleged victim. *See* Docket Item 13 at ¶ 15-16.

phone call had left her in fear for her personal safety." *Id.* at ¶ 16.  Instead, the email "addressed '[Doe-2's] involvement' in an 'alleged incident'" and stated that she was "prohibited from having contact with [the male student]." *Id.*  The male student was similarly told to stay away from Doe-2, but "no other disciplinary action was taken against him." *Id.*  In fact, the male swimmer "continue[d] as a member of the swim team" even though Niagara knew about the rape and "that . . . [the male swimmer] had other law enforcement contact while he was a student at [Niagara]." *Id.* at ¶ 23.

After the mutual no-contact order was issued, the male swimmer, "along with others, continued a pattern of attempting to intimidate [Doe-2] by being present near her while she [was] on campus." *Id.* at ¶ 23.  As a result of the rape and its aftermath, Doe-2 "experienced fear and anxiety" and "sought treatment for post-traumatic stress disorder, anxiety[,] and depression." *Id.*

Throughout this time period, Niagara was obligated to "address certain aspects of its Title IX compliance." *See id.* at ¶ 3.  The United States Department of Education Office of Civil Rights ("OCR") had intervened in a different sexual harassment complaint in 2016, and in response, Niagara entered into a Voluntary Resolution Agreement ("VRA"). *Id.*  Under the VRA, Niagara was to "provide training to all University staff responsible for reporting incidents of sexual harassment." *Id.* at ¶ 58.  But "staff failed to file any such reports with regard to complaints made by" any of the plaintiffs.  *Id.*  The VRA also required Niagara, "by September 2017[,] to review prior complaints of harassment and discrimination and, among other things, determine whether steps were taken to prevent the recurrence of sexual harassment and to address any hostile environment created by any sexual harassment." *Id.* at ¶ 59.  Nevertheless, "no formal

investigation into the swimming and diving program was initiated, no changes were made to the structure of that program (including addressing staffing concerns), and there were no other remedial actions" taken before the plaintiffs commenced this action. *Id.*

In addition, Niagara had "reported to OCR that it conduct[ed] forums for segments of the population it [] determined may be particularly vulnerable to incidents of sexual assault/harassment/misconduct, including athletes." *Id.* at ¶ 57. But during the relevant time period, "no such forums were held with the men's or women's swim teams despite ongoing complaints by women swim team members of harassment and bullying by members of the men's swim team." *Id.*

## DISCUSSION

### I.   LEGAL STANDARD

To survive a motion to dismiss, a complaint must include sufficient factual matter, accepted as true, "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "The issue is not whether a plaintiff will or might ultimately prevail on her claim, but whether she is entitled to offer evidence in support of the allegations in the complaint." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College*, 128 F.3d 59, 62 (2d Cir. 1997).

10

## II.  TITLE IX

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Sexual harassment is a form of discrimination prohibited by Title IX.  *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 649-50 (1999).  A college or university that receives federal funding is liable under Title IX for deliberate indifference to acts of student-on-student sexual harassment. *Roskin-Frazee v. Columbia Univ.*, 2018 WL 6523721, at *4 (S.D.N.Y. Nov. 26, 2018). "To survive a motion to dismiss, a plaintiff bringing a student-on-student sexual harassment Title IX claim must allege that: (1) a federally[-]funded educational institution (2) was deliberately indifferent to and (3) had actual knowledge of (4) sexual harassment that was so severe, pervasive, and objectively offensive that it could be said to have deprived the plaintiff of access to the educational opportunities or benefits." *Id.* (citing *Davis*, 526 U.S. at 650).

A college or university has actual knowledge when "a school official with authority to address the alleged discrimination had actual knowledge . . . of the discrimination." *Carabello v. New York City Dept. of Educ.*, 928 F.Supp.2d 627, 638 (E.D.N.Y. 2013). (citing *Hayut v. State Univ. of New York*, 352 F.3d 733, 750 (2d Cir.2003) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998))).  Constructive knowledge is not enough.  *See Gebser*, 524 U.S. at 285 (concluding that "it would 'frustrate the purposes' of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of *respondeat superior* or constructive notice, *i.e.*, without actual notice to a school district official").

11

"A defendant acts with deliberate indifference for Title IX purposes 'when the defendant's response to known discrimination is *clearly* unreasonable in light of the known circumstances.'" *Roskin-Frazee*, 2018 WL 6523721, at *4 (emphasis in original) (citing *Gant ex rel. Gant v. Wallingford Bd. Of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999)). The clearly unreasonable standard requires more than mere negligence; "it is a high standard that seeks to eliminate any risk that an educational institution 'would be liable in damages not for its own official decision but instead for [another individual's] independent actions.'" *Id.* (citing *Davis*, 526 U.S. at 649).

## A.   *Karasek* Objection

Niagara's first objects that "the R&R erroneously adopted, and applied, a differing pleading standard in heavy reliance upon the Ninth Circuit's recent decision in *Karasek v. Regents of the Univ. of Cal.*, 948 F.3d 1150 (9th Cir. 2020)," [8] "effectively eviscerat[ing] the 'actual knowledge' requirement." Docket Item 28 at 9-10. More specifically, Niagara argues that

> Magistrate Judge Roemer recommended the rejection of the University's arguments focused [sic] on the absence of requisite actual notice in Jane Doe-2's case, commenting that, "the Court finds *Simpson* [*v. Univ. of Colo. Boulder*, 500 F.3d 1170 (10th Cir. 2007)] and *Karasek* persuasive for the premise that a university can certainly be liable under Title IX for a policy of deliberate indifference to a heightened risk of sexual harassment known to exist within a particular group or context, *and possibly beyond that.*" Magistrate Roemer continued, "a cognizable pre-assault claim may even be found to *extend campus-wide, beyond a particular group or program . . . .* "[I]t will not foreclose the possibility that a plaintiff could adequately allege

---

[8] The Ninth Circuit amended its decision in April 2020.  *See Karasek v. Regents of the Univ. of Cal.*, 956 F.3d 1093, 1113 (9th Cir. 2020).  Subsequent references to *Karasek* cite the amended opinion.

> causation even when a school's policy of deliberate indifference *extends to sexual misconduct occurring across campus*."

*Id.* (emphasis in objection) (quoting R&R) (citations omitted).

Niagara correctly quotes the R&R.  But Niagara omits what Judge Roemer said next:

> The Court acknowledges the serious concern of permitting pre-assault liability without context-specific notice.  However, Doe-2 has done more than make a general allegation of sexual misconduct on campus or object to inadequacies in the university's reporting and response policies.  Doe-2 has alleged that her assailant was a part of a "particular group that had a known history of sexual harassment, akin to the situation in *Simpson*."

Docket Item 24 at 15 (citing *Tubbs v. Stony Brook Univ.*, 343 F. Supp. 3d 292, 320 (S.D.N.Y. 2018)).

Niagara's omission is at best careless and at worst disingenuous.  As the omitted language makes clear, Judge Roemer did not rely on a campus-wide or constructive-knowledge theory to find that Doe-2 pleaded a cognizable pre-assault claim.  On the contrary, Judge Roemer found that because "two coaches, the athletics department director and assistant director, the Dean of Students, and the Title IX Coordinator" knew about the inappropriate behavior but failed to "take[ action] to prevent further harm, . . . a reasonable jury could conclude that Niagara's response to these incidents was 'clearly unreasonable in light of the known circumstances.'"  *Id.* at 15-16 (citing *Gant*, 195 F.3d at 141).  For that reason, he found that the "plaintiffs have adequately pleaded that [Niagara] had 'actual knowledge of a heightened risk that is specific enough to allow it to remedy' its policy of deliberate indifference to sexual harassment perpetrated by male swimmers."  *Id.* at 16 (citation omitted).

Contrary to Niagara's assertion, Judge Roemer did not "effectively eviscerate[]" the actual knowledge requirement, nor did he "supplant it with the far less rigorous

'known or obvious'" standard.  *See* Docket Item 28 at 10.  Rather, he found that the

plaintiffs adequately alleged Niagara's actual knowledge of rampant sexual misconduct

connected with the swim team and the consequent heightened risk of sexual assault by

a male swimmer.  *See* Docket Item 24 at 15-16.  Disingenuous or just careless,

Niagara's objection on this point misrepresents the R&R and Judge Roemer's findings.

What is more, Judge Roemer's reliance on *Simpson* and *Karasek* for the premise

that a school's official policy of deliberate indifference can establish Title IX liability was

consistent not only with those two cases but with the Supreme Court's decision in

*Gebser* as well.  In *Simpson*, the Tenth Circuit held that a "funding recipient can be said

to have 'intentionally acted in clear violation of Title IX,' . . . when the violation is caused

by official policy, which may be a policy of deliberate indifference to providing adequate

training or guidance that is obviously necessary for implementation of a specific

program or policy of the recipient."  *Simpson*, 500 F.3d at 1178.  The plaintiffs in

*Simpson* were sexually assaulted by football players and high-school football recruits

during a recruiting visit.  *Id.* at 1173.  During recruiting visits, the university paired

recruits with female "[a]mbassadors" who were supposed to show the recruits a "good

time."  *Id.*  The plaintiffs' claims essentially were that the university "sanctioned,

supported, even funded, a program (showing recruits a 'good time') that, without proper

control, would encourage young men to engage in opprobrious acts."  *Id.* at 1177.

The Tenth Circuit discussed *Gebser* and *Davis* at length but found that the claims

before it "ha[d] critical elements that ma[d]e the student-on-student harassment

framework" of *Gebser* and *Davis* "imperfect for [its] analysis"—namely, that "in those

cases there was no element of encouragement of the misconduct by the school district."

*Id.* at 1174, 1177.  The court also relied on the Supreme Court's statement in *Gebser* that limited the strict actual knowledge requirement to "cases like [*Gebser*] that do not involve official policy of the [school district]."  *See id.* at 1177 (citing *Gebser*, 524 U.S. at 290).  The Tenth Circuit ultimately found that because the risk of sexual assault in the recruiting program was "obvious," the university's failure to remedy the risk amounted to a policy of deliberate indifference that violated Title IX.  *See id.* at 1178, 1180.

In *Karasek*, the Ninth Circuit similarly found that "*Gebser* and *Davis*[] support[] imposing Title IX liability when a school's *official policy* is one of deliberate indifference to sexual harassment in any context subject to the school's control."  *Karasek*, 956 F.3d at 1113 (emphasis added).  The court would "not foreclose the possibility that a plaintiff could adequately allege causation even when a school's policy of deliberate indifference extends to sexual misconduct occurring across campus."  *Id.*  But it acknowledged that doing so would be "difficult" and that "Title IX does not require [the university] to purge its campus of sexual misconduct to avoid liability."  *Id.* at 1114 (citing *Davis*, 526 U.S. at 648).

This Court agrees with the courts in *Simpson* and *Karasek* that those decisions were in no way inconsistent with *Gebser.*  In *Gebser*, the Supreme Court held that "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond."  *Gebser*, 524 U.S. at 290.  The recipient's response must "amount to deliberate indifference to discrimination"—"[t]he premise, in other

words, is an official decision . . . not to remedy the violation." *Id.* And that is what the courts in *Simpson* and *Karasek* found.

The Second Circuit has not addressed the "pre-assault" Title IX claim or the "official policy" theory of liability. See *Tubbs*, 343 F. Supp. 3d. at 319. District courts in this circuit, however, have found *Simpson* persuasive for the premise that a university's official policy of deliberate indifference can establish Title IX liability. *See id.*; *see also Roskin-Frazee*, 2018 WL 6523721, at *5. These courts have interpreted *Simpson* to mean that "a plaintiff must allege additional facts beyond past incidents of assault on campus to sustain a pre-assault Title IX claim," but those facts need only give the school notice "of a heightened risk that is specific enough to allow it to remedy such a policy." *See Tubbs v. Stony Brook Univ.*, 2016 WL 8650463 at *8, *10 (S.D.N.Y. March 4, 2016).

The plaintiffs have met this burden here. Doe-2 alleges that Niagara knew about the heightened risk of sexual assault by male swimmers and that its systemic failure to intervene is what led to her assault. *See, e.g.,* Docket Item 13 at ¶¶ 2, 7. Judge Roemer relied on *Simpson* and *Karasek* for the premise that a university can be liable under Title IX "for a policy of deliberate indifference to a heightened risk of sexual harassment known to exist within a particular group or context." *See* Docket Item 24 at 15. And this Court agrees with Judge Roemer's reasoning and conclusion.

But even if *Simpson* and *Karasek* took *Gebser* too far, Judge Roemer's R&R still would be correct. Indeed, completely consistent with *Gebser*, Judge Roemer found that Niagara had actual knowledge of discrimination within the swimming program and that a jury could find that Niagara was deliberately indifferent. *See id.* at 16. In other words,

Judge Roemer found that a jury could interpret Niagara's actions as an official decision not to remedy the culture of sexual misconduct within the swimming team. *See id.*; *see also Gebser*, 524 U.S. at 290 ("The premise, in other words, is an official decision . . . not to remedy the violation."). Niagara's objection to the Ninth Circuit's slightly broader standard in *Karasek*, and the parade of horribles it claims will follow, therefore, is both overblown and inapposite here.

The essence of Niagara's objection seems to be its disagreement that Niagara's knowledge of male swimmers' history of sexual misconduct was sufficient to provide it with actual notice of the risk of sexual assault to a non-swimmer. *See* Docket Item 28 at 12. As explained in more detail below, this Court disagrees with that premise and instead agrees with Judge Roemer that Niagara indeed had actual knowledge of the heightened risk of sexual assault by a male swimmer against a female, including a non-swimmer. *See infra.*

**B.     Pre-Assault Claim**

**1.      Risk of Sexual Assault**

Niagara argues that it did not have actual knowledge of the risk of sexual assault by a male swimmer. *See* Docket Item 28 at 15-16. Niagara specifically objects to Judge Roemer's conclusion that "lesser harassment may [] provide actual notice of sexually violent conduct." *Id.* at 16. It bases its objection on the fact that the "lesser harassment" here did not involve "overtly sexual conduct." *Id.* This Court disagrees.

Contrary to Niagara's argument, the sexual harassment here undoubtedly was overtly sexual conduct. The names "slut," "cunt," and "pussy"—which male swimmers "repeatedly" called female swimmers—each are examples of sexualized language

meant to degrade, objectify, and harass. *See* Docket Item 13 at ¶ 78. Similarly, "[r]anking" female swimmers by physical appearance is conduct that sexualized and objectified the female swimmers. *See id.* Commenting on female swimmers' bodies also was overtly sexual conduct—especially when considered alongside the ranking—because it was another way for male swimmers to objectify, demean, and sexualize female swimmers.

Without a doubt, female swimmers were "targeted" for this name-calling and body-shaming precisely *because of* their gender. *See id.* at ¶ 78. And if all that were not enough, the "[s]exual innuendos" of "finish harder," "get it up, get it in," "let's get wet," and "moaning to emulate sexual gratification" have plain sexual meaning and in the context here were used for no reason other than to communicate that meaning. *See id.* at ¶¶ 78, 80. Based on those allegations, the complaint plausibly alleges overtly sexual conduct that was "engrained in the overall environment of the swimming team." *See id.* at ¶ 80.

Likewise, the physical violence alleged is a far cry from the "simple acts of teasing and name-calling among school children" for which Title IX is not actionable. *See Davis*, 526 U.S. at 653. Biting someone can be, and here in context may well have been, overtly sexual conduct. *See* Docket Item 13 at ¶ 82. And holding a female swimmer's head under the water until she "struggled to breathe" is a serious allegation and one that demonstrates male swimmers' willingness to use physical force to exert power and control over female swimmers—physical force that risked causing serious bodily harm and fear for the female swimmer's safety. *See id.*

The physical violence and sexual harassment also went hand in hand: male swimmers used both tactics together to establish dominance and control over female swimmers, and female swimmers were targeted for both forms of harassment because of their gender.  *See id.* at ¶ 81 (explaining that male swimmers both physically and verbally harassed Doe-1).

Moreover, as Judge Roemer observed, all the alleged behavior falls under the definition of "sexual harassment" prohibited under Title IX, *see* Docket Item 24 at 18 (citing 34 C.F.R. § 106.30); therefore, all were the sorts of behavior that Niagara was obliged to guard against, *see Doe v. School Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1258 (11th Cir. 2011).  So the plaintiffs indeed have alleged "lesser harassment" that provided actual notice that something more might well occur.  *See id.* ("[L]esser harassment may still provide actual notice of sexually violent conduct, for it is the risk of such conduct that the Title IX recipient has the duty to deter."); *see also Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1290, 1294 (11th Cir. 2007) (finding complaint sufficient to withstand motion to dismiss where the plaintiff alleged that the university recruited an athlete and failed to sufficiently monitor his behavior despite knowing about his history of lesser sexual harassment, including groping a female employee and "whistl[ing] at and ma[king] lewd suggestions to a female store clerk").

This conclusion does not change simply because the complaint does not specifically name Doe-2's rapist as one of the male swimmers who sexually or physically abused female swimmers, as Niagara suggests it should.  *See* Docket Item 28 at 15.  The complaint speaks of male swimmers broadly and about a pack mentality,

19

with all or most male swimmers participating in the harassment.  *See, e.g.*, Docket Item 13 at ¶¶ 78, 81 (referring to "male swimmers" generally).  Accepting the facts in the complaint as true and drawing all inferences in the plaintiffs' favor, the swim team culture was one defined by the degradation, sexualization, and objectification of women. In this culture, demeaning women as "slut[s]" and "cunt[s]," commenting about their bodies, and hurting or frightening them—all to establish dominance and control—was commonplace.  *See id.* at ¶¶ 78-82.

Doe-2's rapist was a part of this culture and likely benefited from it.  *See id.* at ¶ 7 (describing the swim culture as one in which male swimmers dominated female swimmers and "impose[d] their own discipline and rules").  He, like the other male swimmers, learned that male swimmers could harass and hurt women without consequence and that they might be rewarded for—or at the very least, stay on the team in spite of—the harassment.  *See id.* at ¶ 11 (noting that a male swimmer with history of harassment was hired as a "graduate assistant coach").  The risk of a sexual assault in a culture like this indeed was foreseeable.  At this stage of litigation, therefore, the complaint sufficiently alleges that Niagara's knowledge of the sexual harassment and physical violence within the swim team gave the school notice of the risk of sexual assault by a male swimmer.

### 2.    Risk to Non-Swimmers

Niagara also argues that Doe-2's complaint should fail because she was not a member of the swim team.  *See* Docket Item 28 at 17-18.  The bulk of Niagara's arguments on this point rehash the arguments raised in its original brief.  None of those are availing.

Although the Second Circuit has not addressed the bounds of the actual notice requirement in pre-assault Title IX claims, "no circuit [that has addressed the issue] has interpreted *Gebser*'s actual notice requirement so as to require notice of the prior harassment of the Title IX plaintiff *herself*."  *See Doe*, 604 F.3d at 1257 (emphasis in original) (citing *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1154 (10th Cir. 2006) ("Although *Gebser* makes clear that actual notice requires more than a simple report of inappropriate conduct by a teacher[,] . . . the actual notice standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student.") (internal quotation and citation omitted); *Baynard v. Malone*, 268 F.3d 228, 238 n.9 (4th Cir. 2011) ("We note that a Title IX plaintiff is not required to demonstrate actual knowledge that a particular student was being abused.")).

So the focus here properly is on the particularized risk posed by male swimmers—not on the risk to a particular person.  *See Simpson*, 500 F.3d at 1180-81 (focusing on the risk of sexual assault in the particular context of the football recruiting program).  In *Simpson*, for example, the university knew about the risk within the recruiting program because it knew about years-old prior assaults (significantly, ones that involved different players, victims, and head coaches); the risk of sexual assault by student-athletes in general; and that its current policies were insufficient to adequately respond to that risk.  *See id.* at 1184-85 ("A jury could infer that 'the need for more or different training of player-hosts was so obvious, and the inadequacies so likely to result in Title IX violations, that [the coach] could reasonably be said to have been deliberately

indifferent to the need.'") (internal marks omitted) (citation omitted).  The same is true here.

At the time of Doe-2's assault in fall 2018, Niagara had known about the sexual misconduct within the swim team for at least two years.  *See* Docket Item 13 at ¶ 9 (Doe-1 reported the harassment to Brooke "[b]y at least 2016"); *see id.* at ¶ 10 (Doe-1 reported the harassment to Roarke in spring 2016).  Niagara also knew that there was a general lack of supervision on the team and that the lack of supervision, together with Ben's operation of the swim team, enabled—or at least allowed—the misconduct.  *See id.* at ¶¶ 10-11, 76.  But no remedial measures were taken to address the individual instances of sexual misconduct, and no changes were made to the structure of the team.  Indeed, the diving team did not have its own coach from mid-2016 to 2018, meaning that "students on the dive team were not accompanied or supervised by a coach when they traveled to out of town meets."  *Id.* at ¶ 9.  Niagara certainly knew that.

Like the university in *Simpson*, Niagara "supported, sanctioned, even funded a program . . . that without proper control would encourage young men to engage in opprobrious acts."  *See Simpson*, 500 F.3d at 1177.[9]  Even worse, because female swimmers repeatedly reported the harassment over the course of at least two years, *see* Docket Item 13 at ¶¶ 9-12, 77, Niagara knew that, without its intervention, the misconduct would continue.  After the OCR investigation and execution of the VRA, Niagara also knew that its prior handling of sexual harassment was insufficient.  *See id.* at ¶ 3, 58-59.  But Niagara did next to nothing and certainly did not effect the changes

---

[9] For instance, as noted above, Niagara hired as a "graduate assistant coach" a male swimmer who was accused of sexual harassment.  Docket Item 13 at ¶ 11.

that it should have made in response to the plaintiffs' claims of sexual harassment.  *See id.* at ¶¶ 58-59.  So contrary to Niagara's assertion, *Simpson* does not present a "markedly different set of facts," *see* Docket Item 28 at 10 n.5; on the contrary, it is quite analogous to the instant matter.

The Court also agrees with Judge Roemer's observation that "it seems arbitrary that the 'actual notice' line must somehow stop with female swimmers being the only students at substantial risk from th[e] misconduct."  Docket Item 24 at 17.  And that is especially so because Niagara not only should have known—but actually knew—that male swimmers had sexual contact with women who were not on the swim team.  *See* Docket Item 13 at ¶ 76 (Doe-1 told Roarke "that on one occasion after hearing that a male swimmer had sex with a female recruit[, Ben] said, '[h]e must not have been very good since she [the recruit] is not coming to [Niagara].'")

Doe-2 therefore has adequately pleaded that Niagara had an "official policy" of "deliberate indifference to providing training or guidance that is obviously necessary" to address sexual misconduct within the "specific program" of the swimming team.  *See Simpson*, 500 F.3d at 1178.  Her pre-assault claim may proceed.

### C.     Post-Assault Claim

Judge Roemer found that Doe-2 did not adequately plead a post-assault claim of deliberate indifference but that she should be permitted to amend the complaint.  *See* Docket Item 24 at 24.  Doe-2 did not object to that recommendation.  *See* Docket Item 31.  This Court therefore will defer addressing that issue until after Doe-2 amends the complaint.

A school's "deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Davis*, 526 U.S. at 644 (internal marks and quotations omitted) (citing Random House Dictionary of the English Language 1415 (1966) ("defining [the verb] 'subject' as 'to cause to undergo the action of something specified; expose' or 'to make liable or vulnerable; lay open; expose'"); Webster's Third New International Dictionary 2275 (1961) ("defining 'subject' as 'to cause to undergo or submit to: make submit to a particular action or effect: EXPOSE'")).

The Second Circuit has not addressed this standard in the post-assault context, and the circuits that have are split on whether a university's deliberate indifference must lead to the plaintiff's subsequent harassment or whether it is sufficient that the deliberate indifference made the plaintiff "vulnerable to" further harassment. *See Kollaritsch v. Michigan State Univ. Bd. of Trs.*, 944 F.3d 613 (6th Circuit 2019) (requiring further incident of actionable sexual harassment); *Farmer v. Kansas State Univ.*, 918 F.3d 1094 (10th Cir. 2019) (allowing post-assault claim where the plaintiffs alleged deliberate indifference caused them to be vulnerable to further harassment).

Whether Doe-2's allegations in the amended complaint meet the applicable standard is a close question. Because this Court certainly agrees with Judge Roemer's recommendation that Doe-2 be allowed to amend her complaint in this regard, however, and because Doe-2 did not object to the recommendation dismissing the post-assault claim, this Court will defer addressing this issue until after Doe-2 has amended her complaint. Niagara then may move to dismiss that claim, and if it does, this Court will address the issue. *Cf. Poynt Corp. v. Innowi, Inc.*, 2019 WL 935499, at *3 (N.D. Cal. Feb. 26, 2019) (deferring ruling on the defendant's motion to dismiss as to the plaintiff's

trade secret claims pending discovery); *Robinson v. Salazar*, 838 F. Supp. 2d 1006, 1034 (E.D. Cal. 2012) (on the defendant's motion to dismiss, deferring the court's ruling on the issue of what deference was owed to the Bureau of Indian Affairs pending the plaintiff's amendment of the complaint).

## III.    BREACH OF CONTRACT

Judge Roemer found that Rolf's claim for breach of contract should be dismissed.  Docket Item 24 at 27.  Neither the plaintiffs nor Niagara objected to that finding, and this Court agrees with it.

To state a breach of contract claim under New York law, a party must plead (1) the formation of a contract, (2) the plaintiff's performance of his or her obligations thereunder, (3) the defendant's failure to perform its obligations, and (4) resulting damages to the plaintiff.  *See, e.g.*, *Nakano v. Jamie Sadock, Inc.*, 2000 WL 680365, at *5 (S.D.N.Y. May 25, 2000).  "A student may sue [her] college or university for a breach of an implied contract in certain situations."  *Prasad v. Cornell Univ.*, 2016 WL 3212079, at *19 (N.D.N.Y. Feb. 24, 2016).  To do so, however, a student "must state when and how the defendant breached the specific contractual promise."  *Id.*  (citations omitted).

A university's general policy statements, rules, or guidelines about fair and equal treatment cannot support a breach of contract claim.  *See Ward v. New York Univ.*, 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000).  "[C]ourts will only enforce terms that are 'specific and concrete.'"  *Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 709 (D. Vt. 2012).

Judge Roemer found that Rolf "failed to assert any specific contractual promise or obligation [that Niagara] has breached."  Docket Item 24 at 26.  This Court agrees.

The most that the complaint alleges is that student-athletes were required to comply with the student-athlete code of conduct and that the male swimmers' behavior violated the code. *See* Docket Item 13 at ¶ 55. But Rolf does not identify anything in the scholarship agreement or elsewhere that created a contractually binding obligation on Niagara to ensure that student-athletes were complying with its codes of conduct. *See Ruegsegger v. Western N.M. Univ. Bd. of Regents*, 154 P.3d 681 (N.M. 2006) (finding that an athletic-scholarship agreement is an enforceable contract but that only the plaintiff, not the university, was bound by the policies and procedures contained therein). Rolf therefore has not pleaded "[Niagara's] failure to perform its obligations" under the contract. *See Nakano*, 2000 WL 680465, at *5.

To the extent that Rolf argues that Niagara's deliberate indifference violated its duty of good faith and fair dealing, *see* Docket Item 22 at 3, "there is 'ample New York precedent [that] a student cannot maintain a breach of contract claim against a university based *solely* on the implied covenant of good faith,'" Docket Item 24 at 26 (citing *Evans v. Columbia Univ.*, 2015 WL 1730097, at *4 (S.D.N.Y. Apr. 29, 2013) (emphasis in R&R). And, significantly, the Court has not found—nor have the parties brought to the Court's attention—any case that has found a cognizable breach of contract claim based on a scholarship agreement for a school's Title IX violation. Rolf's claim for breach of contract therefore is dismissed.

## CONCLUSION

For the reasons stated above and in the R&R, Niagara's motion to dismiss, Docket Item 14, is GRANTED IN PART, DENIED IN PART, and DEFERRED IN PART. The plaintiffs' claims for negligent administration of a Title IX program, common-law

negligence, and breach of contract are dismissed.  Doe-2's Title IX pre-assault claim for gender-based harassment may proceed, and Doe-2 is granted leave to amend her post-assault claim no later than April 9, 2021.  Niagara's motion for an order directing the plaintiffs to provide the names and identities of Doe-1 and Doe-2 is denied as moot.

The case is referred back to Judge Roemer for further proceedings consistent with the referral order of December 9, 2019, Docket Item 15.  If Doe-2 amends her post-assault claim and Niagara moves to dismiss that claim, however, this Court will address the motion to dismiss in the first instance.


SO ORDERED.


Dated:      February 10, 2021
            Buffalo, New York


_____
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE